THE DEPARTMENT OF TRANSPORTATION, Petitioner-Appellee, *v.* CATHOLIC DIOCESE OF BELLEVILLE, Defendant-Appellant.

Fifth District    No. 77-530

Opinion filed August 10, 1978.

O'Connell & Waller, of Belleville (Paul P. Waller, Jr., of counsel), for appellant.

William J. Scott, Attorney General, of Chicago (Roy E. Frazier and Harry J. Sterling, Assistant Attorneys General, of counsel), for appellee.

Mr. JUSTICE JONES delivered the opinion of the court:

Defendant, Catholic Diocese of Belleville, appeals from a judgment rendered for petitioner, the Department of Transportation, in an eminent domain proceeding. The parties settled all issues prior to trial by agreement except the issue of damage to the remainder of defendant's property caused by traffic noise and fumes. General and special jury verdicts found that defendant was not entitled to recover for damage to the remainder and the court entered judgment on the verdicts.

The defendant contends that the court erred in not entering judgment for the defendant notwithstanding the general and special verdicts; that the court ruled erroneously on certain objections to the admission and exclusion of evidence; that the jury was improperly instructed; that petitioner's counsel engaged in a course of prejudicial conduct which deprived defendant of a fair trial; and that the defendant should be granted a new trial because the verdict was against the manifest weight of the evidence.

In dealing with defendant's allegation that the court should. have entered judgment *n.o.v.* we must review the evidence. The applicable rule of law is well settled, that is, that judgment notwithstanding the verdict should have been granted if all the evidence, viewed in its aspect most favorable to the petitioner, so overwhelmingly favored defendant that no contrary verdict based on that evidence could ever stand. *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513.

The property in question is the site of Assumption High School, owned and operated by the Catholic Diocese of Belleville. The school is located in the northeast quadrant of the intersection of Illinois Route 111 and United States Route 50 in St. Clair County, Illinois. The same highways were in existence prior to the construction of the school building but under different numbers. The Department filed a petition for condemnation on September 8, 1967, and title was vested in the Department by a "quick take" proceeding on September 21, 1967. The land condemned consisted of two strips along defendant's property, each approximately 10 feet wide, on the north edge of Route 50 and the east edge of Route 111, and a triangular piece of land in the northwest corner

of defendant's property approximately 104½ feet wide at the widest point. The 10-foot strips were for the purpose of constructing shoulders after additional lanes were added to both highways upon the State's preexisting right of way. The triangular section was used for the placing of dirt to build an overpass to allow traffic on Route 111 to cross over railroad tracks and a section of Interstate 64 which was scheduled to be constructed. The construction of additional lanes and a raised median on each route was completed by August 1968. This phase of the construction included relocating a truck exit to an adjoining property, Allied Mills, later Wayne Feed Co., to a point some 250 feet closer to the school. Construction of the overpass was begun July 1972, and was completed in January 1975. Interstate 64 was completed in November 1976. Defendant filed a motion to fix the date of determining the cost to rehabilitate the school as May 6, 1977, which was allowed.

Prior to trial a settlement was reached on all of the issues in the case except defendant's claim that the remaining property not taken was damaged due to increased traffic noise and fumes. A general verdict was returned by the jury in favor of the petitioner. A special interrogatory was propounded which read, "If you find damage to the remainder, do you find that the damage resulted from the construction and use of the improvement?" The jury answered "no" to this interrogatory. The jury was also polled and each juror answered that this was her or his verdict.

Defendant Diocese presented testimony by the present and two former principals of the school, a student, 17 teachers, the school business manager, two teamster truck drivers, two contractors, two appraisal witnesses, and the security guard of the school. The testimony of the principals, the business manager and the 17 teachers was similar in content. Each person testified as to her or his training and experience in the field of education, position at Assumption School, and dates of service at Assumption. Each then testified as to the extremely high noise levels in the classrooms and gave examples of disruptions and distractions in the classrooms because of the noise. The noise of trucks shifting gears to reach the top of the overpass and to enter and leave the Allied Mills property next to the school was mentioned frequently in this testimony, as was the noise of motorcycle engines. The opinion expressed by each was that the noise level had increased since the construction of the improvements to the highways. There was less emphasis in the testimony as to increased levels of traffic related fumes but an increase in fumes was mentioned in most of the testimony. Of those testifying, only Eugene Meyerpeter, Henry Ringkamp, Anthony Eberhardt, Charles Schmitt, James Monken and James Laudenbach were assigned to the school before 1967, prior to the beginning of construction. Eugene Wojcik, Conrad Seibek, Jose Ramirez, Kathleen McGuire, James Dohle, Pamela

Broyles, Diane Weil, Suzanne Schmitz and Mary Beondech came to the school after the first improvements were completed, that is, the widening of the routes, but while the construction of the overpass was yet in progress. The testimony of the last mentioned, Mary Beondech, was stricken in that she was not qualified to express an opinion on quantitative noise levels. Margaret Pride, Mary Neurohr, Wallace Welch and Francis Sontag arrived after completion of all improvements. The same is true of Elaine Laws, the student who testified as to class disruptions due to noise.

The defendant also presented testimony by two professional truckers. They testified that the grade or incline of the Route 111 overpass made more gear changes necessary and doubled or trebled the noise made by a truck in passing the school while climbing that incline to cross I-64 and the railroad tracks.

Two appraisers testified that the worth of the school had been significantly decreased due to the construction of the improvements and that the recommended method of cure was to seal the windows and air condition the building completely. Each testified as to the probable cost to perform this work and the probable figure of decrease in value. Two contractors testified as to the cost estimates of sealing and air conditioning. A security guard at the school testified as to the figures she obtained in a traffic count kept by herself on the three days prior to trial.

This testimony adduced by defendant was controverted by the evidence adduced on behalf of the Department. A consulting engineer testified for the Department as to the results of sound tests he conducted at Assumption on April 22, 1971, and April 25, 1977. On the occasion of the first test he was there for approximately two hours. The second test was approximately one hour and 20 minutes. He gave specific figures as to the different readings made in the same rooms under comparable conditions in 1971 and 1977. He was permitted to testify as to his opinion concerning the noise level in the years he made the tests. He gave as his opinion that the noise level from outside noise had decreased from 1971 to 1977. He testified that from his observation during the tests, traffic volume had decreased during those years. He observed that semitrailer trucks were a significantly smaller portion of the traffic in 1977 than in 1971. He opined that sealing and air conditioning the school was unnecessary and that a great deal of the noise in the school was due to student activity. He testified that the construction of the improvements, particularly the overpass, had bettered the noise situation, as traffic, including large numbers of trucks, were no longer being backed up by trains at the crossing but instead kept moving on the overpass.

There was rebuttal testimony from the executive director of the school that part of the students were in a lunch period during the time of the 1977 sound tests and that part of the tests were made in the corridor outside the

lunchroom. Further, testimony was given which indicated that during the time of the tests in 1977, the exit onto Route 111 from I-64 was closed. Evidence adduced by the petitioner, however, made it clear that even though the approach to the I-64 exit to Route 111 was blocked, it was still possible to make the turn and exit nonetheless. The period of time in which I-64 was closed on the day c ᶜ the 1977 tests was established as 12 minutes, and this period of time occurred during the last few minutes of the expert's tests.

A State of Illinois traffic studies engineer testified concerning actual traffic counts made at the intersection of Routes 50 and 111 in 1966 and again in 1977. The traffic was counted manually for eight hours on May 13, June 1, 3, 1966, at different eight-hour periods. On January 12, 18, 19, and 20, 1977, a manual traffic count was done for six hours each day, at different six-hour periods. These actual figures were converted by computer into daily average traffic counts. The daily average traffic figures as prepared by the State showed a decrease of traffic on these routes from 1967 to 1977, both in total traffic and in trucks, the noise from which featured heavily in the testimony of the Diocese's witnesses. This expert identified certain exhibits which were presented by the petitioner, prepared in the form of charts and graphs, by the State of Illinois from information gathered by it. One exhibit showed that total vehicle registrations in Illinois was approximately five million in 1967 and approximately seven million in 1975. Large truck registration increased from approximately 8½ thousand in 1967 to approximately 13½ thousand in 1975. Motorcycle registration in St. Clair County increased from 2200 in 1967 to over 5000 in 1975.

Petitioner called a real estate appraiser who testified that he appraised the Assumption property on April 23, 1971, and again a few days before trial. In his opinion there was no damage to the remainder of defendant's property. He based this opinion on an inspection of the property, on traffic studies and traffic counts and on the reports of "experts in the field of sound" whom he named as the sound engineer who testified for the Department and also one Arthur Niemoeller.

The Department called to the stand Monsignor Sullivan of the Diocese to ask if the Diocese had hired a Dr. Niemoeller, an acoustical engineer to do sound studies at Assumption, to which the Monsignor replied that the Diocese had done so.

There was discussion in chambers prior to the start of the trial concerning the fact that the Diocese had decided not to present testimony by Dr. Niemoeller. Counsel for the Department indicated that during the deposition taken of Dr. Niemoeller shortly before trial he had expressed the opinion that noise at the school had lessened since filing of the

Department's petition. During the course of the trial the jury viewed the school premises.

Counsel for the Diocese argues that the evidence as we have reviewed it here meets the standard for entry of judgment *n.o.v.* as set forth in *Pedrick*. But we disagree. There was sufficient evidence presented by each party which, if believed by the jury, would justify a verdict in its favor. The *Pedrick* case indicates that in evaluating the denial of the motion for judgment *n.o.v.* we must view the evidence in its aspect most favorable to the petitioner. Defendant argues that it presented "the best evidence available" on the question of the presence of noise on defendant's property. It points out that persons who lived and worked at the school testified from their own daily experience that noise and fumes often reached intolerable levels and that in their opinion those levels had increased after completion of the improvements. However, many of these witnesses, while positive in their testimony as to the severity of noise and fumes, came to the school after the improvements were completed and had no basis for comparing noise and fume levels before and after the construction of the improvements. Others arrived after the widening of Routes 50 and 111 but while construction of the overpass was in progress. Only six witnesses out of those presented were assigned to the school at such times as to permit them to testify from their own experience concerning noise and fume conditions at the school both pre and post construction. We emphasize that the question at issue was not whether the noise and fume levels at the school interfered with academic and athletic activities but whether they had increased to that point due to the construction and use of the improvements on Routes 50 and 111.

The Department presented evidence which contradicted the conclusions of those witnesses of defendant who were competent to compare pre- and postconstruction noise and fume levels. The Department's sound expert testified that his instrument readings were lower in 1977 than in 1971; that in his observation there was less traffic in 1977; that one noise-creating situation, that of traffic backed up while waiting for a train to pass, had been eliminated by construction of the overpass. Defendant argues that the tests performed in 1977 were inaccurate due to a blocking of traffic on I-64 at the Route 111 exit. However, the surrebuttal testimony showed that while the approach to the exit ramp was blocked during this time that it was possible nonetheless to make the turn and exit onto Route 111. Further, because traffic was blocked on I-64 for 12 minutes need not necessarily invalidate a test extending over one hour and 20 minutes. It was also not shown what percentage of the traffic on Route 111 came from I-64.

Next the Department presented testimony from a highway engineer

and exhibits identified by him. The daily average traffic as based on actual traffic counts performed under the direction of this witness showed a decrease in traffic from 1967 to 1977, both in total traffic and in truck traffic, the noise from which featured heavily in the testimony of the Diocese's witnesses. This evidence supports the conclusion that even though traffic noise may have been at a high level at the school in 1977 it may well have been worse in 1967 before the improvements were begun. Defendant argues that the counts made for 1977 were not representative in that they were taken in January, described in defendant's brief as "the coldest winter in 29 years." However, there was no evidence submitted to this effect. This information was contained in a remark by counsel for the defendant. Even if this were the case, the jury was able, from their own experience, to weigh what effect, if any, this fact would have had on the accuracy of the count. The manual traffic count made by the security guard at the school on the three days prior to trial conflicted with the figures obtained by the Department's witness. However, the jury was not bound to accept the figures testified to by either witness.

The Department's traffic engineer also identified exhibits prepared from data gathered by the State of Illinois which showed an increase in total vehicle registrations in Illinois from approximately five million in 1967 to approximately seven million in 1975. Large truck registrations increased from approximately 8½ thousand in 1967 to 13½ thousand in 1975. Motorcycles, the noise from which was mentioned frequently in the testimony of Diocese witnesses, increased registrations in St. Clair County from 2200 in 1967 to over 5000 in 1975. These facts would support the conclusion that if there were indeed any increase in traffic on Routes 50 and 111, as testified to by defendant's witnesses, that it was caused, not by the improvements constructed on these routes, but by an increase in the numbers of vehicles using the roads in Illinois generally.

Defendant presented testimony from professional truckers that the grade of Route 111 made more gear changes necessary to reach the top of the overpass than when the road was a flat surface. However, it was also testified by a witness for the petitioner that this same overpass eliminated noisy traffic tieups, including trucks, while waiting for trains to cross Route 111.

Appraisal experts were presented by both parties. Experts for each side were equally qualified and gave directly contradictory testimony. Which expert to believe was a question for the jury to decide; not this reviewing court on the basis of the cold record.

The testimony of the contractors presented by the school went simply to the costs of sealing and air conditioning the school. Neither contractor attempted to testify as to the necessity for these measures.

Lastly, we note that the jury viewed the premises and were not totally dependent upon the testimony of witnesses alone.

■■ We are of the opinion that this was not a proper case for the entry of a judgment *n.o.v.* The evidence was contradictory. Each side presented evidence which, if believed by the jury, was sufficient to sustain a verdict in its favor. There was not such a dearth of evidence for one party on the dispositive issue in the case as in *Pedrick*, such as would justify the entry of a judgment *n.o.v.*

■■ Next defendant argues that the court erred in striking certain testimony proffered by the defendant. Specifically defendant complains that the court struck testimony from several witnesses concerning the siren noise on emergency vehicles, and that siren noise had increased following completion of the overpass. Defendant argues that this testimony was circumstantial evidence that the siren noises were a result of the construction of the overpass. We agree with petitioner that this was circumstantial evidence of nothing. It was direct evidence that siren noise existed. The court struck this portion of the testimony as too speculative and not tending to connect the noise with the use of the improvement. We agree with the ruling.

■■ Defendant argues that testimony from Wallace Welch that he had to hold a handkerchief to his mouth so he could breathe through the fumes should have been admitted. This testimony was properly struck as this incident did not occur on defendant's property but on the overpass itself.

■■ Defendant complains that the court struck the proffered testimony that traffic on I-64 had been light for several weeks prior to trial because of repairs and the presence of barriers. Presumably this testimony was offered to attempt to establish that the jury viewed the premises when traffic was not normal. This testimony was refused as irrelevant. We also fail to see the relevancy of repairs to another route some 12 to 10 miles from defendant's property.

■■ Defendant contends that the court erred in refusing its instruction on circumstantial evidence, IPI Civil No. 1.03 (2d ed. 1971). We have reviewed all the evidence in some detail and we are unable to share defendant's view that any of its evidence is circumstantial in nature. It appears to us to be direct evidence bearing on the point in issue. When no circumstantial evidence is presented an instruction on circumstantial evidence should not be given. *Kortlander v. Chicago Transit Authority* (1965), 56 Ill. App. 2d 48, 205 N.E.2d 516.

Defendant Diocese argues that counsel for the Department engaged in a course of conduct which was unfair and prejudicial and deprived the defendant of a fair trial. This course of conduct allegedly consisted of

remarks which imparted to the jury the fact that sound tests had been made, at the request of the Diocese, by a Dr. Arthur Niemoeller, who was not called as a witness. Defendant relies primarily on *Department of Transportation v. Gonterman* (1976), 41 Ill. App. 3d 62, 354 N.E.2d 76, and *Department of Public Works & Buildings v. Hall* (1975), 30 Ill. App. 3d 831, 333 N.E.2d 701, as authority for this contention. In *Gonterman* the court held that it was prejudicial error for counsel for the landowner to attempt to elicit testimony concerning the conclusions of an appraiser hired by the Department on the issue of damage to the remainder, when this person was not called as a witness by the Department. Counsel also argued to the jury that the Department, in failing to call this witness had withheld relevant information. The error was compounded by the giving of an instruction to the effect that the jury might infer that the failure to call this witness was due to the fact that the testimony would be damaging. In the *Hall* case the landowner called two appraisal witnesses who had also appraised the property in question for the Department. The Department moved to prevent the landowner from revealing that fact to the jury. The trial court denied this motion and the appellate court found prejudicial error.

■■ We agree with petitioner that there are differences in the instant case which make the reasoning of *Gonterman* and *Hall* inapplicable. In those cases there was no indication that the party who originally used the services of the appraisers relied on their work in any manner. Certainly they did not present testimony based on the work of the appraisers. Such is the situation here. The testimony of one of the contractors concerning the costs of sealing and air conditioning the school was admittedly based on the specifications supplied by Dr. Niemoeller and we think it fair to infer from the testimony of the second that his cost estimate was likewise based on Dr. Niemoeller's specifications. As we read the record the inquiries of counsel for the Department were confined to ascertaining what was the basis of the testimony presented by the Diocese. Further, no such instruction as the court condemned in *Gonterman* was given here, and counsel for the Department did not directly argue to the jury, as there, that information had been withheld from them. In making its rulings on this issue the court was fully advised as to the intentions of counsel for the Department and placed certain limitations on any inquiry concerning the matter. Specifically, neither the contents of Dr. Niemoeller's report nor the report itself were to be revealed to the jury. These limitations were not exceeded by counsel for the Department. We find no error.

■■ Lastly, the defendant argues that even if no error occurred in the admission and exclusion of evidence and the giving of instructions that the case should nonetheless be reversed in that the verdict was against the

manifest weight of the evidence. In our view of the evidence, which we have discussed in detail, the issue of damage to the remainder was properly given to the jury for decision. As we have noted, there was evidence from both parties which would have been sufficient to sustain a verdict in its favor, if this evidence had been believed by the jury. The jury was present, heard and observed the witnesses, and themselves viewed the premises. We are not permitted to "sit as a second jury to consider the nuances of the evidence or the demeanor and credibility of the witnesses." (*Stringer v. McHugh* (1975), 31 Ill. App. 3d 720, 723, 334 N.E.2d 311.) The verdict was neither "unreasonable, arbitrary, [nor] unsupported by the evidence." *Stringer v. McHugh.*

For the foregoing reasons the judgment is affirmed.

Affirmed.

G. J. MORAN and FRIEDMAN, JJ., concur.